UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

THE UNITED STATES OF AMERICA

**Hon. Hugh B. Scott**

02CR255

v.

Report
&
Recommendation

Mohamed Albanna et al.,

Defendants.

Before the Court are the defendants respective omnibus motions (Docket Nos. 29, 42 and 68)[1].

**Background**

On January 8, 2004, a Superceding Indictment was issued charging Mohamed Albanna ("Albanna"), Ali A. Albanna ("Ali Albanna"), Ali Taher Elbaneh ("Elbaneh") and Abdul Wali Kushasha ("Kushasha") with conspiring to conduct an unlicensed money transmitting business in violation of 18 U.S.C. §1960(b)(1)(A) and (B) (Count I).    The Superceding Indictment also charged all four defendants with conducting the unlicensed money transmitting business (Count II); failing to file a currency transaction report in violation of 31 U.S.C. §5313 and 5322 (and regulations promulgated thereunder) (Count III); and criminal forfeiture in the amount of $3,520,984.00 pursuant to 18 U.S.C. §982 and 21 U.S.C. §853 (Count VI).  In addition, the

---

[1]   This motion on behalf of Mohammed Albanna (Docket No. 68) was submitted to the Court on July 23, 2004 but not administratively entered on the docket until October 13, 2005. The record reflects that the motion was contemporaneously served on all parties, was responded to, and argued along with the motions filed on behalf of the other defendants in this case.

Superceding Indictment charges Mohamed Albanna with two counts of assisting in the filing of a false tax return in violation of 26 U.S.C. §7206 (Counts IV and V).

The government asserts that on December 6, 2001, the Department of Homeland Security, Immigration and Customs Enforcement ("ICE") was contacted by Federal Express ("FedEx") regarding a package being sent to Yeman from a business operated by Albanna, Queen City Cigarettes and Candy ("Queen City").  Members of a Joint Terrorism Task Force (comprised of agents from ICE and the Federal Bureau of Investigation ["FBI"]) opened the package and examined the contents.  The package allegedly contained checks drawn from a Key Bank account utilized by Queen City.   The government opened several other similar packages allegedly placed by the defendants with Federal Express and United Parcel Service ("UPS") over the course of a several month investigation.  The government asserts that its investigation revealed that Albanna sent large amounts of money in the form of money orders and checks drawn on the Queen City account to an entity known as the Juban Exchange in Sanaa, Yemen. In addition to the checks and money orders, the packages included ledgers reflecting the names of the individuals in the United States who were sending the money; the names of the recipients of the funds in Yeman; and the commission Queen City was to receive for the transfer.  As part of its investigation, the government obtained authority to eavesdrop with respect to two telephones located inside Queen City.  On December 12, 2002, a search warrant was issued authorizing the search of properties located at 1282 Clinton Street in Buffalo, New York; 167 Lehigh Avenue  and 58 Ingham Avenue in Lackawanna, New York. According to the government, ledgers were found reflecting that the defendants transferred approximately $1.7 million in 2001 and $2.9 million in 2002.

The defendants deny that they violated any state or federal laws.

The motion filed on behalf of Elbaneh and Ali Albanna seeks the following relief: (1) disclosure of <u>Brady</u>[2] material: (2) the identification of informants; (3) disclosure of material under Rule 404(b) of the Federal Rules of Civil Procedure ("Fed. R. Civ. Proc."); (4) discovery pursuant to Rule 16 of the Federal Rules of Criminal Procedure (Fed. R. Crim. Proc) and notice pursuant to Rule 12(d) of the Fed. R. Crim. Proc.; (5) a Bill of Particulars; (6) the search of the personnel files of government agent witnesses; (7) the preservation of evidence; (8) disclosure of information under Rule 807 of the Fed. R. Civ. Proc.; (9) the suppression of physical evidence; (10) an audibility hearing with respect to tape recordings; (11) suppression of evidence obtained pursuant to eavesdrop orders; and (12) suppression of evidence obtained as a result of searches at 1282 Clinton, 176 Lehigh and 58 Ingham as well as the evidence obtained as a result of the searches of the Federal Express packages. (Docket No. 29).  In addition, Ali Albanna moves to suppress any statements he may have made to government agents at the time of the execution of a search warrant on December 17, 2002. (Docket No. 42).   Defendant Albanna joins in the motions brought on behalf of Elbaneh and Ali Albanna (Docket No. 68).[3]

A suppression hearing was conducted on March 21, 2005 and April 12, 2005. The last post-hearing submission was filed on September 16, 2005.


**Inspection of International Mail Packages**

The defendants argue that the warrantless searches of the FedEx and UPS packages was illegal and that any evidence obtained as a result of those searches must be suppressed.   In the instant case, it is not disputed that federal agents instructed both FedEx and UPS employees to

---

[2]   <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

[3]   All discovery issues will be dealt with in a separate Decision & Order.

"look out" for packages going to certain destinations in the Middle East.  It is further undisputed

that this instruction directed the carriers to notify the agents regarding "any" packages to those

destinations, not merely packages which exhibited certain suspect characteristics in addition to or

apart from their Middle East destination.  It was based upon these instructions that the FedEx and

UPS employees notified the agents involved in this case of the packages at issue.  The

government asserts two arguments in support of the search of the packages: (1) that the

defendants lacked a reasonable expectation of privacy in the packages because the FedEx and

UPS waybills signed by the defendants allowed for the inspection of the packages; and (2) that

the such packages bound for international destinations are subject to warrantless border searches.

   In giving the packages over to FedEx or UPS for international transport, the defendants

signed a waybill – a contract– which expressly allowed the carriers to open and inspect the

contents of any package.  Under a heading "Right of Inspection," the UPS waybill stated:

> The carrier reserves the right to open and inspect any package
> tendered to it for transportation.

Government Exhibit 5.

   The language of the FedEx waybill, under the heading "Right to Inspect" is similar:

> Your shipment may, at our option or at the request of
> governmental authorities, be opened and inspected by us or such
> authorities at any time.

Government Exhibit 4.

   The language in the waybills is clear, unequivocal and unconditional.  Such language

constitutes the senders consent to allow the packages to be inspected by the carrier without a

particularized need.  The facts in this case are similar to those in United States v. Young,  350

F.3d 1302, 1307 (11th Cir. 2003).  As in the instant case, in Young the search of FedEx packages

was initiated by a government agent.  Thus, the Eleventh Circuit concluded, it constituted a

4

warrantless government search, and not a private search. Young, 350 F.3d at 1307 citing United

States v. Souza, 223 F.3d 1197, 1202 (10th Cir.2000) (search of UPS package was a government

search where government agent actively encouraged UPS employee to open package, and

employee did so because she was influenced by encouragement).  However, because the waybill

used in the Young case contained language to the effect that FedEx "may, at our option, open

and inspect your packages prior to or after you give them to us to deliver," the sender lacked a

reasonable expectation of privacy in the package.  Id. In addition, the Court held that "[j]ust as

the 'right to inspect' notice defeated [the defendant's] privacy interest, ... it also served to defeat

[the defendant's] Fourth Amendment challenge because it authorized Federal Express, as a bailee

of the packages, to consent to a search." Young, 350 F.3d at 1308 citing Frazier v. Cupp, 394

U.S. 731 (1969).

   The defendants argue that the language included in the contracts at issue should not be

deemed to constitute consent to search the packages because the type font is too small.  The

defendants cite to §4544[4] of the New York State Civil Practice Law and Rules ("CPLR"), but do

not present authority that the type size used in the waybills at issue requires a finding that the

express language authorizing inspection of the packages be negated.  (Docket No. 61 at page 3).

The defendants have failed to present authority that the contracts in question relate to a

---

[4]     Section 4544 states: "The portion of any printed contract or agreement involving a
consumer transaction or a lease for space to be occupied for residential purposes where the print
is not clear and legible or is less than eight points in depth or five and one-half points in depth for
upper case type may not be received in evidence in any trial, hearing or proceeding on behalf of
the party who printed or prepared such contract or agreement, or who caused said agreement or
contract to be printed or prepared. As used in the immediately preceding sentence, the term
"consumer transaction" means a transaction wherein the money, property or service which is the
subject of the transaction is primarily for personal, family or household purposes. No provision
of any contract or agreement waiving the provisions of this section shall be effective. The
provisions of this section shall not apply to agreements or contracts entered into prior to the
effective date of this section."

"consumer transaction" as defined under the statute ("primarily for personal, family or household purposes"). Instead, it appears that the transactions at issue in this case were for commercial purposes, rather than being consumer related. In any event, generally speaking, §4544 is a rule of evidence, and it "does not declare small-type consumer contracts or residential leases absolutely void or unenforceable." Jocar Realty Co. v. Galas, 673 N.Y.S.2d 836, 839 (N.Y.Civ.Ct.1998).

The reasoning in Young is sound. The language contained in the waybills at issue in this case leave no room for doubt that the carriers were entitled to open and inspect the packages without restriction or condition. The defendants have failed to demonstrate that they had a reasonable expectation of privacy with respect to those packages in the face of such express language.[5]

Based on the above, the defendants motion to suppress the evidence obtained as a result of the warrantless search of the international mail packages should be denied.

---

[5]    The government also contends that the inspection of packages bound for international destinations constitutes an extension of a border search for which no probable cause or reasonable suspicion is required. (Docket No. 47 at page 20). However, an "extended" border search is a search that usually is conducted after a person or some property has "cleared an initial customs checkpoint and [has] entered the United States." United States v. Gaviria, 805 F.2d 1108, 1112 (2d Cir. 1986) quoting United States v. Glaziou, 402 F.2d 8, 13 (2d Cir.1968) (dictum), cert. denied, 393 U.S. 1121. Moreover, while it appears that an extended border search does not require a warrant, it has been held that due to the "greater intrusion on legitimate expectations of privacy, [such a search is] permitted only if supported by reasonable suspicion." Gaviria, at 805 F.2d at 1112 quoting United States v. Niver, 689 F.2d 520, 526 (5th Cir.1982)(citations omitted). In any event, in light of the fact that the defendants lacked a reasonable expectation of privacy in the packages at issue, the Court need not address this issue.

**Suppression of Intercepted Wire Communications**

Defendants move to suppress all evidence obtained by electronic surveillance. The defendants assert: (1) that probable cause did not exist for the issuance of the warrants; (2) that the government did not satisfy the necessity prerequisite for the issuance of the wiretaps; (3) that the warrants were issued on the basis of deliberate and reckless use of false statements by government officers requiring a hearing under Franks v. Delaware[6]; and (4) that suppression was required because of alleged delays in the termination and sealing procedures followed by the government in this case.

1.    Probable Cause

The defendants argue that no probable cause existed with respect to the initial or subsequent warrants.   The test for determining probable cause under the federal wiretap statute is the same as the test for determining probable cause for a search warrant. United States v. Diaz, 176 F.3d 52,110 (2d Cir. 1999). Thus, the "totality of the circumstances" test articulated by the Supreme Court in Illinois v. Gates, 462 U.S. 213 (1983), applies. Under that test, the issuing court must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that ... evidence of a crime will be found...." Id. at 238; see Diaz, 176 F.3d at 110.  The government must demonstrate "only a probability" not a "prima facie showing of criminal activity." Gates, 462 U.S. at 235. Furthermore, the evidence must be viewed and weighed "as understood by those versed in the field of law enforcement." Gates, 462 U.S. at 232.   Finally, "[a] reviewing court must accord

---

[6]    438 U.S. 154 (1978).

substantial deference to the finding of an issuing judicial officer that probable cause exists."

United States v. Wagner, 989 F.2d 69, 72 (2d Cir.1993); United States v. Gotti, 42 F.Supp.2d

252, 261 (S.D.N.Y.1999). "Any doubts as to the existence of probable cause should be resolved

in favor of upholding the authorization." United States v. Ambrosio, 898 F.Supp. 177, 181

(S.D.N.Y.1995) (citing Gates, 462 U.S. at 237 n. 10).

The following orders are at issue:

> On September 27, 2002, Hon. John T. Curtin signed an order authorizing interception of wire communications regarding telephone numbers 716-822-5782 and 716-822-5783 as well as the interception of oral communications and visual conduct occurring within the premises of Queen City.

> On October 21, 2002, Hon. William M. Skretny signed an order authorizing the interception of electronic communications over a facsimile machine bearing the number 716-822-0351.

> On October 25, 2002, Hon. William M. Skretny signed an order authorizing the continued interception of telephone numbers 716-822-5782 and 716-822-5783.

> On November 7, 2002, Hon. Richard J. Arcara signed an order authorizing the interception of a cellular telephone bearing the number 716-316-1411.

> On November 22, 2003, Hon. William M. Skretny signed an order authorizing the continued interception of communications over the facsimile machine bearing the number 716-822-0351.

> On October 27, 2002, Hon. John. T. Curtin signed an order authorizing the continued interception of telephone numbers 716-822-5782 and 716-822-5783.

The application in support of the September 27, 2002 Order included an affidavit from

Karen L. Noworyta, a Special Agent with the (then) United States Customs Service.   In her

affidavit, Noworyta advised the Court that an analysis of Queen City's bank records obtained

pursuant to a Grand Jury subpoena revealed that Albanna and the other defendants would send

checks to Yemen which were cleared through the Queen City account.  Further, whenever

Albanna and/or Queen City deposited currency exceeding $10,000 into their bank account, that

caused the bank to file a Currency Transaction Report ("CTR") which identified the owner of the

currency as 167 Lehigh, Inc. ( Noworyta August  27, 2002 Affidavit at ¶ 11).  According to

Noworyta, however, inspection of Fed Ex packages revealed that checks drawn on those monies

came from a number of persons in the Yemeni community.   Thus, according to Noworyta, the

CTR's contained material misstatements as to the owners of the currency in violation of 31

U.S.C. §§ 5322, 5324, 5313 and other federal statutes .  (Noworyta August  27, 2002 Affidavit at

¶ 12-14).   Noworyta advised the Court that Queen City was not licensed to engage in the

business of transmitting money.   (Noworyta August  27, 2002 Affidavit at ¶ 14).

Notwithstanding, bank records revealed that between September 2000 and September 2001,

checks were written on the Queen City account totaling $1.03 million payable to the Juban

Exchange in Yemen.   Between 2001 and 2002, checks totaling $1.7 million were drawn on the

Queen City account payable to the Juban Exchange in Yemen.  (Noworyta August  27, 2002

Affidavit at ¶ 15).   The Noworyta Affidavit also detailed the information obtained as a result of

the inspection of the FedEx packages, including the checks drawn on the Queen City account

being sent to Kushasha at the Juban Exchange in Yemen; ledgers identifying transaction

numbers, amounts, senders, receivers, and  commissions relating to the money transfers.

(Noworyta August  27, 2002 Affidavit at ¶¶  18-78).  In addition, Noworyta described

communications from a confidential informant (CS-1) in which the informant stated that he had

sent money to his family in Yemen through the defendants and Queen City which operated as a

"hawala."[7]  (Noworyta August  27, 2002 Affidavit at ¶¶ 79, 81).  CS-1 identified the target

---

[7]     According to the government, a "hawala" is an informal money transmitting
organization commonly used by individuals of Middle Eastern descent to send money from the

telephone number as the number used in connection with this money transmitting activity. (Noworyta August  27, 2002 Affidavit at ¶ 81).  The Noworyta Affidavit also contains the Agent's description of communications from a second confidential informant (CS-2) who stated that he utilized the defendants operation to send money to his family in Yemen on more than one occasion.  CS-2 also identified the target telephone number as the number he used in these activities.   (Noworyta August  27, 2002 Affidavit at ¶ 82).  A third confidential source (CS-3) stated that he had met with Albanna to discuss sending money from Detroit, Michigan, through Buffalo to Yemen. On July 10, 2002, CS-3 engaged in a consensually recorded conversation with Albanna over the target telephone number and discussed the shipment of money to Yemen. (Noworyta August  27, 2002 Affidavit at ¶¶ 84-86).  Finally, Noworyta's Affidavit sets forth the information obtained as a result of pen registers obtained against the target telephone number. This information reveals a pattern of telephone calls between the target number and Yemen consistent with the money transmitting activities described above.  (Noworyta August  27, 2002 Affidavit at ¶¶  87-96).[8]

In asserting that the government failed to establish probable cause, the defendants challenge the government's interpretation of some of the underlying statutes (i.e. Docket No. 29 at ¶ 74); offered contrary arguments regarding the significance of some of the money transfers

---

United States to the Middle East.  Norowyta states that a "hawala" is illegal to operate in the United States unless the entity transmitting the money is registered to engage in such a business. (Noworyta August  27, 2002 Affidavit at ¶ 79).

[8]   Noworyta's Affidavit also included information regarding other on-going investigations involving Albanna with respect to the illegal trafficking of pseudoephedrine.  The information presented in this regard is extremely limited and appears to be of little value in assessing the existence of probable cause.  Assigning no weight to such information, the Noworyta Affidavit presents sufficient information to establish the existence of probable cause with respect to the alleged illegal activities involving the money transfers which were the subject of the eavesdrop orders.

(Docket No. 29 at ¶¶ 82-83); and disputed the government's ability to inspect the international mail packages without a warrant. (Docket No. 29 at ¶¶ 76-80).

Based upon a review of the information presented to Hon. John. T. Curtin in support of the September 27, 2002 Order, probable cause existed to support the issuance of the Order.  The Noworyta Affidavit clearly sets forth information demonstrating a probability that the defendants were involved in illegal activities and that the target telephone number was utilized to further those alleged illegal activities.

The applications with respect to subsequent Orders recount some of the information presented in support of the September 27, 2002 Order, in addition to setting forth new information obtained as the ongoing investigation progressed.  For example, Noworyta's October 21, 2002 Affidavit includes statements regarding money transfers which were obtained pursuant to the September 27, 2002 Order allowing for a wire tap on the Queen City telephones. (Noworyta October 21, 2002 Affidavit at ¶¶20 a-j).   Similarly, Noworyta's October 25, 2002 Affidavit submitted in support of the October 25, 2002 Order describes information obtained pursuant to intercepted telephone calls further evidencing the allegedly illegal money transfers by the defendants. (Noworyta October 25, 2002 Affidavit at ¶¶21-46).  A review of each of the applications supporting the various Orders reflects that probable cause existed to support the issuance of the respective Orders inasmuch as each builds upon the information previously found to be sufficient to establish probable cause with respect to the September 27, 2002 Order.

The motion to suppress evidence obtained by electronic surveillance on the grounds that probable cause did not exist to support the issuance of the eavesdrop orders should be denied.

2.      Necessity

The defendants argue that the government failed to establish the necessity of the wiretap warrants.  In this regard, the defendants rely principally on United States v Lilla,  699  F.2d  99 (2d  Cir. 1983).  It should be noted that Lilla  has  been distinguished at least three times by the Second Circuit itself and by at least two District Courts in this Circuit. United States v. Torres, 901 F.2d 205  (2d Cir.), cert. denied sub nom. Cruz v. United States, 498 U.S. 906 (1990); United States v. Puglisi, 790 F.2d 240 (2d Cir. 1986); United States v. Ruggeno, 726 F.2d 913 (2d Cir.), cert. denied sub nom. Rabito v. United States, 469 U.S. 831 (1984); United States v. Blount, 30 F. Supp.2d 308 (D. Conn. 1998); and United States v  Crozzoli, 698 F. Supp. 430 (E.D.N.Y. 1988).

An application for electronic surveillance must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(3)(c). Although these requirements control the use of such intrusive measures, they "were not intended to turn electronic surveillance into a tool of last resort." United States v. Valdez, 1991 WL 41590, *2 (S.D.N.Y. 1991), aff'd, 952 F.2d 394 (2d Cir. 1991).   Further, these requirements are to be construed in a "common sense and realistic fashion." Ruggiero, 726 F.2d at 924.  As the Second Circuit has repeatedly made clear:

> The purpose of the[se] statutory requirements is not to preclude the
> use of electronic surveillance until after all other possible means of
> investigation have been exhausted by investigative agents;  rather,
> they only require that the agents inform the authorizing judicial
> officer of the nature and progress of the investigation and of the
> difficulties inherent in the use of normal law enforcement methods.

Torres, 901 F.2d at 231.

In assessing whether the government has satisfied this burden,  the Second Circuit has warned that the averments alleged  in  connection with the use of normal  investigative techniques are not to be reviewed *de novo*.  Torres, 901 F.2d at 231.  The role of the reviewing Court instead is simply to "decide if the facts set forth in the application were minimally adequate to support the determination that was made." Torres, 901 F.2d at 231; see Ruggiero, 726 F.2d at 924 (use of certain normal investigative techniques-- such as search warrants, grand juries or interviews--unnecessary where such techniques would publicize  the  investigation" and "perhaps jeopardize the investigation itself"); United States v. Villegas, 1993 WL 535013 (S.D.N.Y. 1993); United States v. Miranda, 1993 WL 410507 at *2-3 (S.D.N.Y. 1993)  (court's initial "determination that normal investigative techniques would not suffice is entitled to substantial deference.").

In her affidavit, Noworyta states that while information obtained from the investigation had been probative, it had not yet yielded sufficient evidence or ascertained the identities of all the participants and co-conspirators in the illegal activities.  (Noworyta August  27, 2002 Affidavit at ¶ 97).  She discussed the other investigative techniques used or attempted and identified the limited results with respect each.  (Noworyta August  27, 2002 Affidavit at ¶ 98-110).   The defendants arguments speculate as to the effectiveness of continued use of traditional investigative techniques. The Court notes that the eavesdrop orders in this case were issues by three different District Court Judges, each of whom was called to determine whether the government had met its  burden to establish the necessity requirement. Particularly in light of the deferential standard to be applied, the defendants' assertion that the government failed to meet the necessity requirement must fail.  A review of each of the applications sufficiently demonstrates the need for electronic surveillance in compliance with 18 U.S.C. §2518 and the

Second Circuit's decision in Torres.

The defendants' motion to suppress the evidence obtained by electronic surveillance on the grounds that the government failed to demonstrate the necessity of electronic eavesdropping should be denied.

3.     Franks Hearing

The defendants seek a hearing under Franks v. Delaware, 438 U.S. 154 (1978), claiming that there were material factual omissions in several of the warrant applications.  The defendants' assertions in this regard go to whether the government had met its burden to establish the necessity for the eavesdrop warrants.

A hearing under Franks is warranted only if a defendant makes a substantial preliminary showing:  (1) that the warrant affidavit includes a false statement or material omission; (2)  that the allegedly false statement was made knowingly and intentionally or with reckless disregard for the truth; and (3) that the allegedly false statement is necessary to a finding of probable cause.  Franks,  438  U.S.  at 171. Statements which result from negligence or innocent mistake are insufficient to justify a hearing.  Further, the Supreme Court held that:

> the challenger's  attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.  There must be allegations  of  deliberate  falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. . . . Affidavits or sworn or otherwise reliable statements of witnesses should be furnished  or their absence satisfactorily explained.  .  .  . The deliberate falsity or reckless disregard  whose  impeachment  is permitted today is only that of the affiant, not of any nongovernmental informant.

Franks, 43S U.S. at 171. To infer recklessness from the fact that an omission existed is warranted only when the material omitted would have been clearly critical to the judicial finding.  United

States v Reivich, 793 F.2d 957 (8th Cir. 1986) (noting that existing precedents for such an inference have in fact only been made when additional circumstances in support of the finding of recklessness existed).  Even if that substantial showing is made, defendants still are not entitled to a hearing unless the allegedly false statements are material to a finding of probable cause. Franks, 438 U.S. at 171-72.  Franks does not require that all statements in an affidavit be completely accurate; it simply requires that the statements be "believed or appropriately accepted by the affiant as true." Franks, 438 U.S. at 165; United States v. Campino, 890 F.2d 588, 592 (2d Cir. 1989), cert. denied, 498 U.S. 866 (1990).   A defendant is entitled to a hearing only if the remaining content is insufficient to support the warrant. Franks, 438 U.S. at 172; United States v. Gotti, 771 F.Supp. 535, 539 (E.D.N.Y. 1991); United States v. Labate, 2001 WL 533714 (S.D.N.Y.  2001).  Moreover, a defendant's submission of his own counter-interpretation of acts does not, by itself, satisfy the showing required for a Franks hearing.  United States v. Jimenez, 824 F. Supp. 351, 361 (S.D.N.Y. 1993).

The defendants have failed to meet their burden to establish the need for a Franks hearing.  As noted above, although the defendants offer varying interpretations of the federal statutes, and challenge the significance of the money transactions described in the affidavits supporting eavesdrop orders, the defendants have failed to articulate the type reckless conduct warranting further inquiry under Franks.

The defendants' motion to suppress should be denied on this basis as well.


4.      Termination

The defendants assert in a conclusory fashion that the investigative objective was achieved "within a short time after the issuance of the August 2002 eavesdrop warrant order."

(Docket No. 29 at ¶ 135).  No warrant to intercept such wire, oral or electronic communications may be authorized "for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty days." 28 U.S.C. §2518(5).  A review of each of the warrants reveals that each was to terminate within 30 days from the date issues.   Thus, each of the seven warrants comply with 28 U.S.C. §2518(5).

     5.     Minimization

     The defendant also argues that the government failed to minimize the interception of calls to avoid eavesdropping on unrelated calls.  Upon a defendant's claim that minimization requirements were not met, the Court must determine whether the actions of the agents, in conducting the telephonic surveillance, were reasonable under the circumstances.  See, Scott v. United States,  436 U.S. 128,  137 (1978).   It is the Government's burden to make a prima facie showing of compliance with the minimization requirements.   See, United States v. Rizzo, 491 F.2d 215, 2117 n.7 (2d Cir.), cert. denied, 416 U.S. 990 (1974); United States v. Baker, 443 F. Supp. 526, 531 (S.D.N.Y. 1977).  Once a prima facie showing is made, the burden shifts to the defendant to show that, despite good faith compliance  with  the  minimization  requirements, "substantial unreasonable interception of non-pertinent conversations occurred." United States  v. Ianiello,  621  F.  Supp  1455,  1470  (S.D.N.Y.), aff'd, 809 F.2d 184 (1985).

     In response to the instant motion, the government has submitted minimization reports demonstrating that a significant percentage of the intercepted calls were minimized.   Moreover, the fact that ten-day progress reports were submitted to the issuing Judges during the period of authorized interception is "strongly supportive of the claim that the minimization requirement has been satisfied." United States v.Falsetti, 721 F.Supp. 452, 458 (W.D.N.Y.

1988).  Based on the above,  the Court finds that the government has met its burden to make a

prima facie showing of compliance with the minimization requirements.

The defendant has failed to establish that a substantial number of non-pertinent

conversations were intercepted unreasonably.  See, United States V. Cirillo, 499 F. 2d 872, 881

(2d Cir. 1974)(in absence of any evidence that a substantial number of non-pertinent calls were

intercepted unreasonably, no minimization hearing is required).


6.      Sealing

Section 2518(8) (a) of Title 18 of the United States Code provides:

> Immediately upon the expiration of the period of the order, or
> extensions thereof, such recordings shall be made available to the
> judge issuing such order and sealed under his directions. [emphasis
> added].


The Second Circuit has held that sealing delays of up to two days are permissible without

additional explanation.  United States v. Pitera, 5 F.3d 624, 627 (2d Cir. 1993), cert, denied 510

U.S. 1131 (1994).

The defendants articulate two specific claims: (1) that the recordings made pursuant to the

August 27, 2002 Order were not sealed until October 7, 2002; and (2) that the recordings made

pursuant to the October 24, 2002  Order, which was to expire on November 24, 2002, were not

sealed until November 26, 2002.  (Docket No. 29, at ¶ 152).   The second claim need not be

addressed inasmuch as the sealing took place within two days.  The defendants contention

regarding the August 27, 2002 Order is equally without merit.  The defendants fail to

acknowledge that the August 27, 2002 Order was extended on September 26, 2002 and again on

October 25, 2002.  Thus, the fact that the government chose to seal some of the recordings on

October 7, 2002 is immaterial inasmuch as the government was entitled pursuant to §2518 to

wait until the expiration of the October 25, 2002 extension before sealing the recordings.  There

were no sealing delays in this case.


       7.      Eavesdrop Orders Failure to Cite 18 U.S.C. §1960

The defendants also argue that the evidence obtained pursuant to the eavesdrop orders

cannot be used against them because the Orders do not list a violation of 18 U.S.C. §1960 as a

predicate offense underlying the investigation.  The Orders issued by the various District Court

Judges cite to a variety of federal statutes as the basis of the predicate offenses for which the

eavesdrop warrants were issued including 31 U.S.C. §5316(exporting monetary instruments of

more than $10,000 at one time); 31 U.S.C. §5322 (willfully causing a financial institution to file

a CTR containing a material misstatement); 18 U.S.C. §1963 (racketeering); 18 U.S.C. §1952

(interstate and foreign travel or transportation in aid of racketeering enterprise).  The Orders do

not list 19 U.S.C. §1960 which relates to the illegal operation of a money transmitting business.

Section 2517(5) of Title 18 of the United States Code provides that "[w]hen an

investigative or law enforcement officer, while engaged in intercepting wire, oral, or electronic

communications in the manner authorized herein, intercepts wire, oral, or electronic

communications relating to offenses *other than* those specified in the order of authorization or

approval, the contents thereof, and evidence derived therefrom, may be disclosed or used as

provided in subsections (1) and (2) of this section." (Emphasis added).  The Second Circuit has

held that "authorization under 18 U.S.C. § 2517(5) may be inferred when a judicial officer grants

a continuation of the surveillance, even though the offense was not listed in the original order, so

long as he was made aware of "material facts constituting or clearly relating to the other

offenses." United States v. Ardito, 782 F.2d 358, 362 (2d. Cir. 1986) citing United States v.

Tortorello, 480 F.2d 764, 781-83 (2 Cir.), *cert. denied,* 414 U.S. 866 (1973); United States v.

Marion, 535 F.2d 697, 703-04 (2 Cir.1976).  The requirements of §2517(5) were amply satisfied

here.

 

      8.      Taint Hearing

In light of the Court's findings as to the defendants' challenges to the wiretap warrants,

the defendants derivative request for a taint hearing must also be denied.

The defendants motions to suppress the evidence obtained pursuant to electronic

surveillance should be denied.

 

**Search Warrants**

On December 12, 2002, this Court issued search warrants authorizing the search of 1282

Clinton Street in Buffalo, as well as 167 LeHigh Street and 58 Ingham Avenue in Lackawanna.

The defendants assert that the warrants were issued without probable cause. (Docket No. 29 at ¶

161).

Initially, the government contends that the defendants have not established that they have

standing to challenge the search warrants at issue.  The record includes an affidavit from Albanna

stating that 1282 Clinton Street is rented by Queen City; that Queent City is a d/b/a of a

corporation (167 Lehigh Inc.) owned by his wife; that he is the manager of that business; that he

works out of the facility on a full time basis; and conducts both business and personal affairs

from that location. (Docket No. 40).  The record also includes an affidavit from Ali Albanna

regarding 58 Ingham Avenue.  he asserts that the house is owned by his father, Abdul Albaneh; that at the time of the execution of the search warrant, and for seven years prior to that time, he lived at the house in the lower apartment with his cousin. (Docket No. 41).  These allegations are not disputed by the government.  It appears that the respective defendants have established standing to challenge the searches of 1282 Clinton Street and 59 Ingham Avenue.  The defendants have not submitted papers demonstrating a basis to conclude that standing exists to challenge a search of 167 Lehigh Street.[9]

In any event, probable cause existed to support the issuance of each of the search warrants.  In support of the warrant requests, the government provided the Court with an affidavit from Agent Noworyta dated December 12, 2002.  In her affidavit, Noworyta detailed the investigation into the activities of Albanna, Ali Albanna, and Elbaneh, Queen City in the operation of an illegal money transmitting business, including the information obtained from inspection of international mail packages and the eavesdrop warrants.  The information obtained in the investigation reflected that the defendants utilized Queen City's location at 1282 Clinton to operate the alleged money transmitting business. Queen City's address was used as the return address on most of the packages sent to Yemen in furtherance of the alleged money transmitting business; Queen City's bank account was used as a conduit for the sending of funds to Yemen; intercepted telephone conversations reflected that money to be sent to Yemen as part of the alleged illegal activities was delivered to the defendants at 1282 Clinton Street. (Noworyta's December 12, 2002 Affidavit at ¶¶9-27).

The information obtained in the investigation also reflected that Albanna used his

---

[9]     It does not appear to be disputed that 167 Lehigh Street is the residence of Albanna and his wife.

residence at 167 Lehigh Street in furtherance of the money transmitting business. Specifically, various intercepted telephone calls indicated that individuals utilizing the defendants' alleged money transmitting services would sometimes drop off money and/or checks at 167 Lehigh Street.  According to recorded conversations, these funds were sometimes kept in a bag on top of the refrigerator at that location. (Noworyta's December 12, 2002 Affidavit at ¶¶30-31). Similarly, the intercepted telephone conversations reflected that Ali Albanna was conducting activities relating to the money transmitting business away from Queen City's Clinton Street store and that he allowed individuals to drop off money at his home at 58 Ingham Avenue. (Noworyta's December 12, 2002 Affidavit at ¶¶39-41).

Thus, with respect to each of the locations which were subject to the respective search warrants, upon a review of the totality of the circumstances, a probability existed that evidence of a crime would be found at those locations. Illinois v. Gates, 462 U.S. 213 (1983).[10]


**Ali Albanna's Statements**

Ali Albanna also seeks to suppress certain statements he made on December 17, 2002 at the time of the execution of the search warrant for 1282 Clinton Street.  Ali Albanna contends that his statements were made prior to being advised of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). Further, he contends that he was "in custody" at the time he made the statements.

---

[10]     The defendants also assert, in a conclusory manner, that the searches exceeded the scope of the warrants in that "personal items" were seized which were not particularized in the warrants. (Docket No. 29 at ¶168).  The defendants do not identify any particular item to support such an allegation. Thus, the defendants have not demonstrated that a hearing is warranted in this regard.

A suppression hearing was held on March 21, 2005 and April 21, 2005.   Agent Noworyta testified that she participated in the execution of the warrant at 1282 Clinton Street on December 17, 2002. (Docket No. 58 at 7).  She stated that she arrived at the location with two other agents.  They went in to speak with Albanna. After a brief conversation, they exited the store and then re-entered to execute the search warrant. (Docket No. 58 at 8).  Noworyta stated that Ali Albanna was not present at the time the search was first commenced, but arrived a couple of minutes after the search was underway. (Docket No. 58 at 9).  She testified that at the time the search was commenced, the agents asked Albanna and anyone else who wished to stay during the search to contain themselves to a section in the rear of the store where a coffee pot and table were located. (Docket No. 58 at 10). Ali Albanna went to the rear of the store with Albanna and the others.  Noworyta stated that neither Ali Albanna, nor the other individuals, were forced to sit back there, they were not threatened, they were not placed under arrest, and they were not restrained in any way. (Docket No. 58 at 12). Noworyta testified that at some point she approached Ali Albanna and asked, through an interpreter,  if he would like to speak with her. Ali Albanna agreed to speak with her, and the three of them (Ali Albanna, Noworyta and the interpreter) went to the front of the store. (Docket No. 58 at 16).   According to Noworyta, she advised Ali Albanna that he was not under arrest and that he did not have to talk to her if he did not want to. (Docket No. 58 at 16).  She asked him about the money transmitting business. Noworyta asserts that Ali Albanna stated that he "picked up money on behalf of his uncle [Albanna] at least once a week" and that his uncle took care of the money transferring. (Docket No. 58 at 17).  According to Noworyta, this conversation took place between 11:15 and 11:30 am on the day of the search. (Docket No. 58 at 18). Ali Albanna was subsequently arrested at approximately 1:30 pm that day. (Docket No. 58 at 19).

22

Raouf Khalil testified at the suppression hearing on April 21, 2005.  He stated that he was a contract translator working with the United States Customs department on December 17, 2002. Khalil speaks Arabic.  He testified that he accompanied the law enforcement agents to that location during the execution of the search warrant.  Khalil testified that he acted as a translator during a conversation between Noworyta and Ali Albanna (Docket No. 59 at 11).  According to Khalil, at the time of the conversation, no guns were drawn and that Ali Albanna was not being threatened, handcuffed or otherwise restrained. (Docket No. 59 at 12).

Ali Albanna contends that he did not feel that he was free to leave and that he felt compelled to answer Agent Noworyta's questions. (Docket No. 44 at ¶¶ 5-6).  The defendant argues that Noworyta was aware that the United States Attorney's Office was before the Grand Jury seeking an arrest warrant for Ali Albanna at the time of the conversation. (Docket No. 58 at 68).  Further, the defendant points out that the government acknowledges that he was subject to a "pat down" and his pockets were emptied onto the table when he entered the store during the search. (Docket No. 58 at 74).

The record reflects that Ali Albanna was not "in custody" at the time of his conversation with Agent Noworyta.  The defendant does not contend that he was told he was under arrest, threatened with force, handcuffed or otherwise physically restrained. He does not assert that he was physically intimidated by Noworyta.  The fact that a police officer monitored his movements while he was at the location during the search does not require a finding that he was in custody at that time.  The defendant's assertion that he believed he would not be allowed to leave is contradicted by the fact that co-defendant Elbaneh *was allowed to leave* during the search even though Agent Noworyta was aware that the United States Attorney's Office was seeking an arrest warrant for him as well as Ali Albanna. (Docket No. 58 at 85).   The defendant has not

articulated a reasonable basis for his contention that he was "in custody" at the time of the conversation with Agent Noworyta.  Indeed, the record suggests that at the time of the conversation at issue, the defendant would have been able to leave the premises if he chose to do so.

Based on the above, the statements made by Ali Albanna were not the result of custodial interrogation and it was not required that he be provided with his <u>Miranda</u> warnings at that time. Thus, the defendant's motion to suppress his statements should be denied.

### Conclusion

Based on the above, the defendants motions to suppress evidence should be denied.

Pursuant to 28 USC §636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as WDNY Local Rule 72(a)(3).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME,  OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.**  <u>Thomas v. Arn</u>, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed2d 435 (1985); <u>F.D.I.C. v.</u>

Hillcrest Associates, 66 F.3d 566 (2d. Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988); see also 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and WDNY Local Rule 72(a)(3).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance.  See Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to WDNY Local Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 72.3(a)(3)may result in the District Court's refusal to consider the objection.**

So ordered.

s/Hon. Hugh B. Scott
United States Magistrate Judge

Buffalo, New York
October 15, 2005